# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　Plaintiff,<br><br>　　v.<br><br>JESSE AGUS MARTINEZ,<br><br>　　　　　　　　Defendant. | Case No.: 25-mj-06054<br><br>COMPLAINT FOR VIOLATION OF<br><br>Title 18, U.S.C., Sec. 545 – Importation Contrary to Law (Felony) |

　　The undersigned complainant, being duly sworn, states:

　　On or about October 23, 2025, within the Southern District of California, defendant JESSE AGUS MARTINEZ, did knowingly import merchandise, to wit: two orange-fronted parakeets, contrary to law, that is, Title 16, United States Code, Sections 1538(c) and 1540(b), in violation of Title 18, United States Code, Section 545.

　　The complainant states that this complaint is based on the attached Statement of Facts incorporated herein by reference.

　　　　　　　　　　　　　　　　　　*Victoria Van Duzer*
　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　Victoria Van Duzer, Special Agent
　　　　　　　　　　　　　　　　　　U.S. Fish and Wildlife Service

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, on November 5, 2025.

　　　　　　　　　　　　　　　　　　*Barbara L Major*
　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　HON. BARBARA L. MAJOR
　　　　　　　　　　　　　　　　　　U.S. MAGISTRATE JUDGE

**STATEMENT OF FACTS**

According to Customs and Border Protection (CBP) reports, on October 23, 2025, at approximately 12:50 pm, MARTINEZ, a 35-year-old U.S. Citizen residing in Mexico, entered the United States, on foot, from Mexico at the Otay Mesa Port of Entry. The primary inspection officer obtained two negative declarations from MARTINEZ. When the primary officer asked MARTINEZ, "You don't have anything with you," MARTINEZ said "No," and opened his arms to display his body, in what appeared to be an effort to prove that he had nothing to declare.



*MARTINEZ attempting to show the primary officer that he had nothing to declare.*

Upon checking CBP records, the primary inspection officer learned that MARTINEZ had previously smuggled birds into the United States in his groin area. MARTINEZ was referred to secondary inspection. While escorting MARTINEZ to secondary inspection, the primary inspection officer noticed that MARTINEZ's groin area seemed abnormally bulging. MARTINEZ claimed several times that the bulge was "pirrin," the Spanish word for penis.

As the primary inspection officer escorted Martinez to the security office area, they passed under the pedestrian bridge. MARTINEZ whistled loudly at someone, and someone

else responded with a volley of whistles. When asked who he was whistling to, MARTINEZ said it was his brother. They continued to the security office for further processing.

In the security office, CBP Officers conducted a pat down on MARTINEZ. At that time, MARTINEZ advised the officers that he had birds in his groin area. The inspecting officer saw a brown material protruding from the waistline of MARTINEZ's underwear. The officer located two brown sacks, each containing one orange-fronted parakeet, in MARTINEZ's underwear.



*One of the captive birds in a sack as it was removed from MARTINEZ' underwear.*



*One of the captive birds as it was being removed from the sack.*

A CBP Agricultural Specialist responded to the security office and removed the birds from the brown sacks. The birds were apparently unconscious, but breathing, and appeared heavily sedated. The birds were later identified by a U.S. Fish and Wildlife Service (USFWS) Inspector as juvenile orange-fronted parakeets. According to USFWS, orange-fronted parakeets (*Eupsittula canicularis*) are native to Mexico and are listed on Appendix II of the Convention on International Trade in Endangered Species of Wild Flora and Fauna ("CITES"). The birds were placed in a bird cage with food and water until they could be cared for by Veterinary Services.



*The parakeets shortly after being confiscated, showing signs of heavy sedation.*

After being advised of his Miranda rights, MARTINEZ agreed to an interview. MARTINEZ stated that the birds were his pets, and he obtained them from his uncle in Mexico. He stated that he had the birds for a couple of weeks. It was MARTINEZ's intent to bring them into the United States and keep them in a shoe box in his van. MARTINEZ reported that he hid the birds in his pants because he didn't have a "bird certificate" to legally

bring them into the United States. MARTINEZ denied sedating the birds but claimed he put them in socks to keep them quiet.

During the interview, MARTINEZ reported that approximately two months prior, he attempted to bring a bird into the United States but was caught by CBP and the bird was confiscated. CBP records indicate that MARTINEZ was apprehended on September 10, 2025, at the San Ysidro Port of Entry with a parrot concealed in a towel under his arm. CBP records indicate that the parrot was subsequently euthanized.

On October 27, 2025, the two birds seized on October 23, 2025, were flown to the United States Department of Agriculture's Animal Import Center in Rock Tavern, New York, for quarantine. The birds are reported to be doing well.



*One of the captive birds after receiving veterinary care.*

No documentation or other paperwork related to the parakeets was located in in MARTINEZ' personal property. According to government records, at the time of

5

1  importation, MARTINEZ did not possess a license from USFWS to import wildlife, nor did
2  he possess or file a USFWS Declaration for Importation or Exportation of Fish or Wildlife
3  (USFW Form 3-177). MARTINEZ did not possess a CITES export permit, certificate of
4  origin, or other CITES documentation that would permit him to lawfully import the parrots.
5  Furthermore, the concealment of the birds would have resulted in their entering the United
6  States without any quarantine period or process.
7     MARTINEZ was issued a Notice to Appear in U.S. District Court on Thursday,
8  November 6, 2025, at 1:30 PM.

### LEGAL FRAMEWORK

CITES is an international agreement among approximately 183 governments, including the United States and Mexico, to protect fish, wildlife, and plants that may become threatened with extinction. CITES establishes import and export restrictions to protect these species from overexploitation through international trade. Under CITES, species are protected according to a classification system known as "appendices." International trade in species listed in these appendices is monitored and regulated by permits and quotas. The permit restrictions apply to live and dead specimens and skins, parts, and products made in whole or in part from a listed species. The Endangered Species Act prohibits any person subject to the jurisdiction of the United States from engaging in any trade or possessing any specimens contrary to the provisions of CITES. 16 U.S.C. §1538(c)(1).

Wildlife and plant species listed in Appendix I of CITES are threatened with extinction. Those listed in Appendix II of CITES include species not presently threatened with extinction but may become so if their trade is not regulated. Appendix II species may be allowed in trade but are strictly regulated and monitored. To import an Appendix II species into the United States, the exporter must obtain a valid "foreign export permit" issued by the specimen's country of origin before importation. Appendix III of CITES includes wildlife and plant species listed by CITES member countries as requiring international trade controls to prevent unsustainable or illegal exploitation of the species.

International trade in such species is allowed only when the appropriate permits or certificates are presented.

Pursuant to the federal regulations implementing CITES, an official CITES document is required to accompany all wildlife imports or exports of a species listed on a CITES Appendix. For imports from Mexico of a species listed on Appendix II, a CITES export permit from Mexico is required. 50 C.F.R. §23.20(e). If an individual wishes to travel internationally with their personally-owned wildlife subject to CITES, they may be exempt from other CITES requirements if they acquire and present upon entry a CITES certificate of ownership for the wildlife from the CITES management authority where they reside. 50 C.F.R. §23.44. In order to obtain a CITES certificate of ownership, the owner must be able to demonstrate that the wildlife was obtained lawfully. *Id*.

All wildlife imported into the United States must be declared to the USFWS. A true and complete declaration Form 3-177, Declaration for Importation or Exportation of Fish or Wildlife, which provides information such as the species, the quantity, the name and address of the recipient, and the intended use of the wildlife, must be filed at or before the time of importation. 16 U.S.C. § 1538(e); 50 C.F.R. § 14.61. Federal regulations also require that the USFWS clear all wildlife imported into the United States, and that the importer or his agent make available the wildlife being imported to the officer and all required permits, licenses, or other documents. 50 C.F.R. § 14.52. The wildlife may only be cleared at certain ports authorized in the regulations, unless specifically authorized elsewhere. 50 C.F.R. § 14.11.

The federal wildlife protection statute known as the Lacey Act is found at Title 16, United States Code, Section 3371 *et seq*. The Lacey Act makes it unlawful for any person to import, export, sell, receive, acquire, or purchase any fish or wildlife or plant taken, possessed, transported, or sold in violation of any law, treaty, or regulation of the United States. 16 U.S.C. § 3372(a)(1).

To obtain clearance for the import of wildlife, the exporter must provide to inspectors at the border, together with the wildlife, all shipping documents (including waybills, bills

of lading, packing lists and invoices); all permits, licenses and documents required by the laws and regulations of the United States; and all permits or other documents required by any foreign country involved in the transaction. 50 C.F.R. §14.52.

In addition, to import many types of wildlife, the wildlife must be subject to quarantine before it can be introduced into the United States. Many animals have diseases that can be transferred to humans (zoonotic diseases) or other animals that can have disastrous health effects to human or animal populations. For example, birds can carry and spread Avian influenza (bird flu), psittacosis, and histoplasmos. Bird flu is highly contagious and can cause flu like symptoms, respiratory illness, pneumonia and death in humans and other birds including birds raised in United States poultry farms. There are many other diseases that can be transmitted from different animals and have disastrous effects, that is why it is necessary to quarantine animals entering the United States to limit and safeguard against this potential disease transmission.